·ELLA AUD AND EDGAR TOWNSEND v. THE STATE.

*No. 932.   Decided May 6th, 1896.*

### 1.   Improper Argument of Counsel.

On a trial of two joint defendants for murder, a man and a woman, where a juror had stated that he was slightly acquainted with one of them, and the County Attorney, after asserting in the most positive manner, that defendants were guilty, said, to the said juror: "You are the only man on the jury who answered that you knew defendant A———; the country expects you to do your duty;" and also said to the jury: "They ask you to turn this man loose, and then, when you do that, if a new trial should be needed for the woman, they want the man cleared so that they .can get his testimony, at least that is my judgment;" and, upon exception being taken, the court reprimanded counsel and instructed the jury to wholly disregard his remarks. Held: No error in the action .of the court.

### 2.   Evidence—Hearsay.

Statements by a third party to a witness, which are not made in the presence of the accused, are hearsay and inadmissible.

### 3.   Jury•Law—Corrupt Juror—Voir Dire Examination—New Trial.

Where a juror stated on voir dire examination, that he had formed and also believed ,that he had expressed an opinion as to the guilt of defendants, but, that he would not be ̇influenced by such opinion; that, if selected, he would try the case alone upon the law ,and the testimony; and defendants did not offer to challenge ·said juror.   Held: It was clearly the duty of defendants̗to question the juror directly in regard to the character of the opinion formed and especially as to the opinion expressed to probe the subject and sound the juror to the bottom in regard to it, and failing to do so, it is too late, after verdict, to attempt to take advantage of their own want of diligence and have the matter investigated upon their motion for a new trial.   Disapproving, Hanks v. State, 21 Texas, 527, on this point.

### 4.   Murder in the Second Degree—Infanticide—Fact Case.

See, facts stated in the opinion, upon which it is Held: That a verdict and judgment of murder in the second degree is amply supported, both as against the mother of the murdered infant, and the other defendant acting with her in the commission of the crime.

APPEAL from the District Court of Cooke.   Tried below before Hon. D. E. BARRETT.

This appeal is from a conviction for murder in the second degree, the punishment assessed against each of the defendants being twenty years' imprisonment in the penitentiary.

The principal features of the case are concisely but clearly stated in the opinion, and no further statement is necessary.

*Davis & Garnett* and *Potter, Potter & Cofer*, for appellants, filed an able brief in the case.   Upon the question of incompetency and corruption of the juror, as ground for new trial, they cited Hanks v. State, 21 Texas, 527; Whar. Crim. Law, 3rd Ed., §§ 31-32; Henrie v. State, 41

Texas, 576; Long v. State, 10 Tex. Crim. App., 198; Nash v. State, 2 Tex. Crim. App., 362; State v. Wheeler (Mo.), 18 S. W. Rep., 925; Graham v. State, 28 Tex. Crim. App., 582; Sewall v. State, 15 Tex. Crim. App., 56. ·

Upon the insufficiency of the evidence, they cited Roseborough v. State, 43 Texas, 570; Willis v. State, 15 Tex. Crim. App., 118; Buntain v. State, Id., 490; Voight v. State, 13 Tex. Crim. App., 21; Hogan v. State, Id., 335.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellants were tried together on a charge of murder, were convicted of murder in the second degree, and each given a term of twenty years in the penitentiary, and from the judgment and sentence of the lower court they prosecute this appeal. On the trial of the case, the prosecuting attorney, in his speech to the jury, said: "Mr. Carr, you are the only man on the jury who answered that you knew Ella Aud. The country expects that you do your duty;" and the County Attorney, just previous to this, asserted in a most positive manner "that the defendants were guilty, and ought to be convicted." It appears from the bill of exceptions, that the juror, Carr, had answered that he was slightly acquainted with the defendant, Ella Aud. Appellants objected to these remarks, and also the following remarks of said attorney: "They ask you to turn this man loose, and then, when you do that, if a new trial should be needed for the woman, they want the man cleared so that they can get his testimony. At least, this is my judgment." Appellants excepted to these remarks of counsel. The court certifies that, on his attention being called to the matter, he reprimanded counsel for making said remarks, and the jury were instructed to wholly disregard them. He further certifies that the last above quoted remarks were not excepted to at the time. In this action of the court there was no error. Appellant, on the trial of the case, introduced a witness by the name of Scaiff, who testified that Wade Allison, about the time that the defendant Ella Aud's baby was drowned, had arranged to take a trip with him to Austin or San Antonio. The defendant proposed to prove further, by said Scaiff, that said Wade Allison, during April, 1894, and prior to the 10th of April 1894, told said witness, Scaiff, that he intended to get what money Ella Aud had, and that his (Allison's) father advised him not to let the grass grow under his feet until he got the money; he (Wade Allison) stating that the damned fool (Ella Aud) did not have a wink of sense, and that if he did not get the money, some other damn son-of-a-bitch would, and that he had as well have it as anybody. This testimony, on objection, was excluded, and the appellant assigns the same as error. The bill shows that this testimony was the mere statement by one Wade Allison, a third party, to said Scaiff, not in the presence of the appellant, and as such was pure hearsay. In motion for new trial, appellants contend that one Slaton, who served on the jury, was not impartial, but had prejudged

the case, and in support of their contention introduced the following affidavits:

"The State of Texas, County of Cooke. I, W. H. Moody, being duly sworn, on oath say that I know W. W. Slaton, who was a member of the jury that tried Ella Aud and Edgar Townsend for the murder of Wade Allison, at the present term of the District Court of this county. I further say that on the evening before the said Slaton was accepted as a juror in said case, that I was standing at Judge J. E. Hayworth's gate, in the city of Gainesville, talking to said Hayworth; that while we were talking, said W. W. Slaton came up to where we were talking at said gate. Said Slaton said to Judge Hayworth: 'Judge, can they make me serve on a jury? I've got a job at the compress and don't want to stop. Dick Blackburn tried to summon me down town to-night, but I got off. If they want their damned necks broke, why just send for me, and I can damned soon break them.' Said W. W. Slaton, in the above conversation was referring to the defendants, Ella Aud and Edgar Townsend. Said Slaton then went on home, his home being in the city of Gainesville, about 150 feet north of me. I further say that on the next morning I went into the court room, and to my surprise saw that defendants had accepted the said Slaton as one of the jury, and that said Slaton did serve as a juror in the trial of said cause. I never told the defendants or either of their attorneys about the above until to-day, when they called on me, and asked me to tell them what I had heard Slaton say. I further say that I am in no wise interested in this case.

his<br>W. X H. Moody.<br>mark

"Subscribed and sworn to before me by W. H. Moody, this May 30th, 1894. [Seal] J. H. Carr, Notary Public, Cooke County Texas."

"The State of Texas, County of Cooke. I, J. E. Hayworth, on oath say that during the evening of the day that W. W. Slaton was summoned as talesman in the case of State against Ella Aud and Edgar Townsend, said Slaton came to my gate, and asked me if he could get off the jury. I told him that he could if he had a legal excuse. Slaton then said: 'I told Dick Blackburn when he summoned me that if they want me to, I would break their God damned necks.' J. E. Hayworth.

"Sworn to and subscribed before me this 30th day of May, 1894. [Seal] P. H. Lanius, Notary Public for Cooke County, Texas."

"The State of Texas, County of Cooke. I, Dick Blackburn, on oath say that I am deputy sheriff of Cooke County, Texas, and as such assisted in summoning the talesmen in the case of State v. Ella Aud and Edgar Townsend. Court had adjourned for the evening without the jury having been completed, and the sheriff was instructed by the court to summon talesmen to be present at the meeting of the court at 8:30 o'clock a. m. the following morning. During that evening, while looking for talesmen, I saw W. W. Slaton, and, knowing that he was working at the compress, I asked him if he was going to work to-morrow. He

said he would. I then told him I would not summon him. The next morning, before the meeting of the court, I saw W. W. Slaton standing in the court house door, and summoned him. W. W. Slaton at no time made any objections to being summoned on the jury. Dick Blackburn.

"Sworn to and subscribed before me this May 30, 1894. [Seal] J. F. Lilly, Clerk District Court Cooke County, Texas, by W. H. Aughtry, Deputy."

"The State of Texas, County of Cooke. In the District Court of Cooke County, Texas. I, J. R. Stevens, on oath say that I am a carpenter by trade, a resident of Gainesville, Texas, and I am 58 years of age. About three weeks ago, while J. A. Cowart, B. H. Boone, and myself were engaged in working on a house for Judge J. E. Hayworth, in Gainesville, Texas, and while we were resting at noon, we were visited by W. W. Slaton, who was afterwards a juror in this case. A conversation then occurred between us in reference to Ella Aud and Edgar Townsend, who were then in jail, charged with the murder of Ella Aud's infant child. In the conversation W. W. Slaton said that defendants, Aud and Townsend, were guilty, and ought to be hung; and that if he should be on the jury he would hang them as high as hemp would hang them. J. R. Stevens.

"Sworn to and subscribed before me this the 30th day of May, 1894. [Seal] W. T. Roberts, Notary Public for Cooke County, Texas."

"The State of Texas, County of Cooke. I, J. A. Cowart, on oath say that I am resident of Gainesville, Texas, and a carpenter by trade, and was present at the conversation at the house of Judge Hayworth, mentioned in the foregoing affidavit of J. R. Stevens. I heard W. W. Slaton say in said conversation that the defendants, Aud and Townsend, were guilty, and ought to be hung, and that if he (Slaton) should be on the jury he would hang them as high as hemp would hang them. J. A. Cowart.

"Sworn to and subscribed before me this the 28th day of May, 1894. [Seal] Ira B. Packard, Notary Public for Cooke County, Texas."

"The State of Texas, County of Cooke. I, B. H. Boone, on oath say that I am a carpenter by trade, and a resident of Cooke County, Texas, and that I was present at the conversation at the residence of Judge Hayworth about three weeks ago, mentioned in the foregoing affidavit of J. R. Stevens, and that the juror, W. W. Slaton, said in said conversation that the defendants, Aud and Townsend, were guilty, and ought to be hung, and that if he should be on the jury he would hang them. B. H. Boone.

"Sworn to and subscribed before me this May 28th, 1894. [Seal] Ira B. Packard, Notary Public for Cooke County, Texas."

Appellants swore that they were ignorant of these statements until after the trial. Slaton responds to the charge of prejudice by stating: "I was a member of the jury that tried defendants, Ella Aud and Edgar Townsend, at the present term of this court. On qualifying on the stand as a juror, I stated that I had an opinion as to the guilt or inno-

cence of the defendants, but that I could disregard that opinion, and try them on the law and the evidence, and that I could try the case as I could one that I never heard of. I also said that I probably expressed my opinion, but I don't remember how I expressed it, or something to that effect. But since my attention was called to it, I remember of one time that I expressed my opinion. The time that I expressed my opinion was when Judge Hayworth and Mr. Moody and I were at Judge Hayworth's gate, as I was working at the compress, and Dick Blackburn summoned me as a juror; and when he first asked me I told him that I was at work, and he then said he would not bother me. That same night it rained, and the next morning I supposed they had a jury, and I came down to town; but that morning Dick Blackburn summoned me again, and I was taken. The conversation came about at Judge Hayworth's with Judge Hayworth and Moody in this way; because we were all laughing and talking about the case. I don't remember whether I asked Judge Hayworth whether they could make me serve on the jury or not, and don't remember what I did say about it. There was no one intoxicated on that jury, and nothing occurred to influence me in rendering my verdict, except the law and evidence." Cross-examination: "When I was examined as to my qualifications as a juror, I remember of being asked the question whether I had any bias in favor of or prejudice against defendants, and I answered that I had none. I am a married man. I never told Mrs. Slaton, or any one else, that the defendants ought to be hung, and that if I was on the jury I would hang them. I am acquainted with B. H. Boone. I know J. A. Cowart. I know J. R. Stevens, who made the affidavit. I am also acquainted with W. H. Moody. I know Judge Hayworth. I might have had a conversation with Stevens, Boone, and Cowart, while engaged in doing work on Hayworth's house, to the effect that the defendants were guilty, and ought to be hung; but I never used that word 'hemp.' I don't remember exactly what I said, but I did not use the word 'hemp.' I don't know whether I said I would hang them as high as rope would hang them, but I don't think I did. I remember of having several conversations with these gentlemen while I was at work on Hayworth's house, but don't remember what I said in the conversations. I think these conversations were had about the time the defendants were arrested. I was living in Gainesville when the defendants were arrested. I was here the morning that the body of the baby was here, and saw the dead baby, and saw its clothes in the court house, and looked at the body, and it must have been after seeing the body that I had these conversations. I live about 100 yards from J. R. Stevens. Judge Hayworth lives thirty or forty yards from me. B. H. Boone lives from one-half to one mile from me. J. A. Cowart also resides in Gainesville, but don't know where he lives, as I am not acquainted with him much. After the motion for a new trial in this case was filed, and after J. A. Cowart made affidavit in this case, I met him on the streets of Gainesville, and called him a God damn lying son-of-a-bitch. I know

that for cursing him I was put under bond. I used the above language to Cowart the evening after we came off the jury. I called him these names and cursed him because he was going around the streets and telling every one about me that I expressed an opinion about the case, and I was mad at him because he was meddling with my business. When I first came off the jury several people came to me and told me that Cowart was telling the people that I swore to a lie on the stand, to get on the jury, and that he was going to make an affidavit to it; and several parties that I didn't know came to see me about it. I then saw Cowart, and told him that I understood that he was telling the people that I swore a lie on the stand, and also started to hit him, and he run, and I cursed him, and I expect that I called him a God damn lying son-of-a-bitch. He told these parties that I had swore a lie on the stand in order to get on the jury. I never cursed J. R. Stevens or B. H. Boone, because they are friends of mine. Nor did I curse Judge Hayworth or Mr. Moody. I remember of having a conversation with Hayworth in the presence of Moody the evening before I was taken on the jury the next morning. In these conversations I may have made a remark that if they got me on the jury I would break their God damn necks, but I didn't intend any harm by it. I don't remember what I said to Dick Blackburn when he summoned me. I remember what I said to Judge Hayworth, and his statement in his affidavit is correct." Re-direct: "It seems to me as though Mr. Cowart has been trying to interfere with my business for twelve months. The County Attorney did tell me that, if Cowart kept following me up, to knock him down. I stated, when I was qualifying as a juror, that I was present during a portion of the examining trial in this case, and that I heard some of the evidence in that trial."

The record shows that Slaton, on voir dire examination, stated that he had formed an opinion, and he also stated that he believed that he had expressed an opinion. This statement that he had formed, and perhaps expressed, an opinion on voir dire, is supported by the testimony of other witnesses. The judge, in his certificate to the bill, states: "When the juror, Slaton, was being examined upon his voir dire, he stated that he had formed an opinion as to the guilt or innocence of the defendants, and that he had expressed such an opinion, but that he would not be influenced by such opinion; that, if selected as a juror, he would try the case alone upon the law and the testimony. The defendants did not offer to challenge said juror." It has been held by our Supreme Court in one case (opinion by Judge Roberts) "that, if the juror had formed an opinion such as would probably influence his action in finding a verdict, that this fact was discovered after the trial, appellant would be entitled to a new trial, notwithstanding he did not question the juror at all." See, Hanks v. State, 21 Texas, 527. The great weight of authority, however, is against this rule. The principle is well settled, that the juror must be tested, either by the State or the appellant, and must qualify himself in order to bring forward this matter on a motion

for a new trial, when the fact that he had formed such an opinion is discovered after the trial. We are of the opinion that under the circumstances attending this case, it was the duty of the appellants, if the State had failed to do so, to question the juror directly in regard to the character of the opinion formed, and especially as to the opinion expressed. This view is supported by our statute, which provides that, if the juror should answer that he had formed such a conclusion, and answers that it would not influence his verdict, "he shall be further examined by the court, or under its sanction, as to how his conclusion was formed, and the extent to which it would affect his action," etc. This was not done. Counsel for appellants had been notified by the answer of the juror that he had formed an opinion, and that he had expressed an opinion. It was clearly their duty, if the State had neglected to do so, to probe this subject, to sound him to the bottom, by asking him the nature of the conclusion, the source from which he obtained his information about the case, and what expressions of opinion he had made, and to whom, etc. If, being deceived by an answer, and they discovered after the trial that the answers were not true, that the opinion was settled or fixed, and that he had so expressed himself, then their motion for a new trial upon this discovered testimony should have prevailed. But we do not believe that they should be permitted to sit quietly by, after receiving such information, and take the chances of a verdict in their favor, and then complain. This would be speculating upon what the juror believed about the case. The juror in this case, so far as examined, stated that he had formed, and perhaps expressed, an opinion. He further stated that, notwithstanding such opinion, he could try the case fairly and impartially. As stated before, it was optional with appellant's counsel to press the inquiry further. On his failure to do so, it is too late after the verdict to then go into the question in order to show that the juror was not a fair and impartial juror. He cannot take advantage of his own want of diligence. He was put upon notice by the very answers of the juror to make such inquiries as would have led him to an ascertainment of the facts, and on his failure to do so, he cannot take advantage of his own want of diligence, and afterwards claim the right to show that the opinion was of such a character as would disqualify the juror from sitting in the case.

It is also contended by the appellants in this case that the evidence is not sufficient to sustain the verdict, and especially as to the appellant Townsend. We have examined the record very carefully in this respect, and to our minds the evidence establishes the perpetration of a crime that in atrocity is rarely met with in the annals of any country. It shows, as to Ella Aud, that in order to marry her paramour she consented to the murder of her own offspring; that she left her home, some twenty-five miles from Gainesville, between 2 and 3 o'clock in the morning in a buggy, with her codefendant, Townsend, and her infant child, to go to Gainesville, and thence to Ardmore, in the Indian Territory, and be married to one Wade Allison. About daylight in the morning they stopped in a creek bottom, about midway between her home and Gainesville. Either

she or her codefendant—the evidence does not make certain which one—took from the buggy her child, and proceeded through the woods some 300 yards down the creek from the road, and there, in a large pool of water, drowned said child.    They proceeded thence to Gainesville, and Ella Aud stopped at the hotel, and Townsend went with the team to a wagon yard.    Ella Aud was delayed there during the day, having missed the train, and also because dresses that she was having made had not been finished.    Her codefendant remained in Gainesville until evening, visiting her several times, when he left and returned to his home.    The child in question was discovered some time in the afternoon of said day by some parties fishing on the creek. The alarm was immediately given, and parties set about to ascertain who had committed the deed. Ella Aud was arrested that night at the hotel, and her codefendant the next day at his home.    The testimony shows that she gave various accounts as to the disposition of her child.    Ella Aud testified in the case, and said that when they stopped at the creek she requested the defendant to build a fire.  He made some objections.  She said that the team belonged to her, and that she would control it.  She got out of the wagon, took the child down the creek, and placed it on the doorstep of a house, and returned. That is what she told her codefendant, Townsend, when she returned to the wagon.   She also states that she delivered the child to Wade Allison, and did not place it on the doorstep.    There is no evidence that Allison was seen in the neighborhood anywhere about that time.  We are of the opinion that the evidence is conclusive as to the guilt of Ella Aud. The evidence in this regard is so certain as to exclude every reasonable hypothesis than that she was a particeps criminis in the act of murdering her own child.    We can put no other construction upon the testimony.    As to her codefendant, Townsend, the fact that he was with her on that fatal day, and that the infant was disposed of under circumstances strongly tending to show that it could not have been destroyed without his knowing that it was to be so disposed of, and that at the time of such disposition he was then doing some act in furtherance of the common design.   We can scarcely conceive that the mother of the child would alone have undertaken to drown it, under the circumstances, without his previous knowledge and acquiescence and assistance in the purpose. She would scarcely have undertaken the murder, and risked the chance of afterwards obtaining his co-operation and silence. Moreover, the different accounts he gave at Gainesville on the same day—in one stating that the Aud girls came to Gainesville with him, and in another that they did not come to Gainesville with him; and he also stated that Ella Aud's baby was in the hands of a gentleman and lady, who were then keeping it for $100 per year, when according to the undisputed evidence in this case, he knew that such was not the case.  Besides this, on his return home that night, where lived the sisters, brother, and brother-in-law of Ella Aud, although he knew of the mysterious disposition of the child, he related to them nothing of this mysterious circumstance and disappearance of the child.    These facts, and others of a cogent character, in

our opinion fasten him to her in the guilt of this transaction as with hooks of steel, and they indicate to a moral certainty, and beyond any reasonable doubt, that he was an active participant with the unnatural mother in this most atrocious and diabolical crime. The charge of the court was full and comprehensive, and covered every salient issue presented by the evidence in the case, rendering unnecessary the special charges asked on the part of the appellants. There being no error in the record, the judgment is affirmed.

*Affirmed.*

[NOTE.—A motion for rehearing, was overruled without a written opinion, on May 19th, 1896.—Reporter.]